**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

|                                              |     |                             |
| -------------------------------------------- | --- | --------------------------- |
| In re:                                       | )   |                             |
|                                              | )   |                             |
| William H. Tanner, Sr. and                   | )   |                             |
| Teresa H. Tanner,                            | )   | Case No.:  05-03502-BGC-7   |
|                                              | )   |                             |
| Debtors.                                     | )   |                             |
|                                              | )   |                             |
| Edmond LeDoux and                            | )   |                             |
| Lavenice LeDoux,                             | )   |                             |
|                                              | )   |                             |
| Plaintiffs,                                  | )   |                             |
|                                              | )   |                             |
| vs.                                          | )   | A. P. No.:  05-00170        |
|                                              | )   |                             |
| William H. Tanner, Sr.,                      | )   |                             |
|                                              | )   |                             |
| Defendant.                                   | )   |                             |

**MEMORANDUM OPINION ON COMPLAINT**
**TO DETERMINE DISCHARGEABILITY**

The matters before the Court are the Complaint Objection to Discharge filed on July 25, 2005; the Plaintiff's Amendment to Complaint filed on November 16, 2005; and the Plaintiff's Second Amendment to Complaint filed on December 22, 2005.

After notice, a trial was held on August 10, 2006.  Appearing were Edmond and Lavenice LeDoux, the plaintiffs; Jerry Quick, the attorney for the plaintiffs; William Tanner, Sr., the defendant; and Thomas Reynolds the attorney for the defendant.  The matter was submitted on the arguments of counsel, the evidence presented, the pleadings, and the testimony of Mr. LeDoux and Mr. Tanner.  Mrs. LeDoux attended the hearing but did not testimony.

## I.  Facts

In 1999, Mr. Tanner, the debtor, was an officer and employee of T.H. Tanner Construction, Inc. (hereinafter referred to as "Tanner Construction" or "the company"), a corporation wholly owned by his wife, Teresa.  His job was to oversee construction for the company.  That included working with customers who wished to have homes built for them by the company.  At that time, Mr. Tanner was a licensed home builder and had been engaged in the business of building houses for approximately 35 years.

During 1999, or some time before, the company purchased 10 acres of agricultural land bordering McClendon Chapel Road in Bessemer, Alabama for the purpose of building a residential subdivision. After purchasing that property, the company sought approval from the county health department to build a subdivision on the property. That approval was required before the county would issue permits to build houses in the subdivision. That process required the company to hire an engineer to draft a subdivision plan showing the proposed location of each house to be built, the boundaries between the five lots into which the plot was to be subdivided, and the location of sewage field lines on each lot. The company obtained that plan and submitted it to the health department. The department studied the plan, performed "perk" tests on each of the prospective lots, and, in conjunction with the company's engineer, determined the final location of the field lines. The location of those lines dictated the locations of the houses on the lots.

After this process, the health department approved the subdivision plan, which is represented by Defendant's Exhibit 2, dated December 27, 1999, entitled "Final Health Department Map Tanner Subdivision." That document illustrates the boundaries between the five lots in the subdivision, where the field lines were required to be installed on each lot, and the proposed locations of the houses on the lots.

The plan provides for one house to be built on each lot. The lots are similar in shape, size, and dimension, and run side by side one another, rather than back to front. Each lot is rectangular and occupies about two acres. Lot 5 is the smallest at 1.94 acres. The plaintiffs contracted for a house to be built on lot 5.

The front boundary of each of the lots borders McClendon Chapel Road. The back boundary of each lot adjoins the back boundaries of the others next to it, so that the back boundaries of all of the lots fall on the same line, which is straight.

The front boundary of Lot 5 is slightly shorter than its back boundary, and is around one-third the length of either of its two side boundaries, which are approximately the same length as one another. The same general description applies to the dimensions, orientation, and boundaries of each of the other four lots in the subdivision.

As shown on Defendant's Exhibit 2, a single square on each lot identifies the proposed building site for a house. A small schematic of lines represents the required location of the field lines for that house. Elevation lines on the map show the relative elevation of each part of every lot. With respect to each lot, the square representing the proposed building site appears in a section of the lot which is more elevated in relation to the remainder of the lot. The schematic of the field lines for the proposed house appear in close proximity to the building site. They are however, in an area less elevated than that to be occupied by the house. In other words, the house is uphill from the field lines but the field lines are otherwise not located in what might be considered a low lying area.

2

Mr. Tanner testified that the location of each initial building site was primarily dictated by the required location of the field lines for the house to be built on that site. Each house had to be positioned relatively close to, and on higher ground than, the field lines to allow gravity to transport waste from the septic tank adjoining the house to the field lines, but the field lines could not be placed in low lying areas.

The subdivision map, Defendant's Exhibit 2, reflects that the front one-third of Lot 5 is very low, the back one-third represents the highest ground on the lot, and the middle one-third falls somewhere between the two. The field lines for Lot 5 are drawn on the back one-third of the lot, opposite the back right hand corner (as one faces the lot standing on the front boundary). One end of the lines extends to around 10-15 feet from the right boundary and around 150 feet from the back boundary. The other end extends to around 45 feet of the right boundary and around 40 feet from the back boundary of the lot. The square representing the proposed building site accordingly appears in that same back one-third portion of the lot, facing squarely toward the street, with the back of the proposed house sitting roughly 10-15 feet from the beginning of the field lines. The right side of the house is square to the lot's right boundary and around 15 feet or so from it. The left side of the house is square to the lot's left boundary and around 100 feet or so from it. The front of the house sits square to the street on the imaginary line which transverses the property at a point roughly one-third of the way from its back boundary and two-thirds of the way from the road.

Mr. Tanner explained that a house could not have been built on the front one-third of Lot 5 because the health department dictated that the field lines be positioned in the back one-third of the lot and because the front one-third was too low and had a deep trench running across it. That trench would have had to have been filled, and a house cannot be constructed on fill dirt. He also explained that there was some leeway with respect to the actual positioning of the house in relation to the field lines as long as he could present evidence to the health department that the sewage would end up in field lines, either by gravity or pumping. Leeway was limited because the position of the field lines, as established by the health department, was not subject to change.

Mr. Tanner described the trench which traversed the front one-third of Lot 5 as hazardous, deep and unsightly. He said that it was so deep that he would have had trouble getting out of it without assistance. He said that it contained water at the bottom, which was seeping out of the ground, like a little creek, and that it also was littered with manmade debris, such as old truck tires. He said that he had planned from the beginning to fill in the trench "for safety sake and also for esthetics and enhancement of the lot." Transcript at 26.

The house site on Lot 4 is situated similarly to the house site on Lot 5. The proposed house sits square to the road, on the back one-third portion of the lot, and about 15 feet from the lot's right boundary. It is, however, positioned approximately 15 feet or so further toward the back boundary than is the house site on Lot 5. If houses were built on the sites shown on the map, the fronts of the houses on Lots 4 and 5

3

would not be parallel to one another.  Instead, the house on Lot 4 would be 15 or so feet more from the road than the house on Lot 5.

After the health department's approval of the subdivision plan, the company advertised the five lots for sale.  The plaintiff, Mr. LeDoux responded to that advertisement by contacting Mrs. Tanner at the company's place of business.  He met Mr. Tanner at the property and examined each of the lots.  At the time, the lots had not been cleared and were still wooded and undeveloped.  Since he was the first customer to express interest in building in the subdivision, Mr. LeDoux had the pick of any lot. After several conversations with Mr. Tanner, some purportedly involving Mrs. LeDoux and Mrs. Tanner, Mr. LeDoux decided to purchase Lot 5 and have Tanner Construction build a house on it.

On July 6, 2000, Mr. Ledoux and his wife paid Tanner Construction $10,000 to hold Lot 5 pending their decision whether to purchase and build on the lot and to work out the details of any construction contract they might enter into with the company.  The parties apparently understood that if they did not reach an agreement the money would be returned to the LeDouxs, but if a contract was finalized the money would be applied toward the purchase of the house and land.  The written agreement reflecting the payment of that money, the company's concomitant agreement to hold the lot, and the provisions with respect to the money's return or application to the purchase price of the house and lot, was admitted into evidence as Plaintiffs' Exhibit 6.

Mr. LeDoux testified that during his wife's and his initial meeting with Mr. and Mrs. Tanner prior to the execution of Plaintiffs' Exhibit 6, it was represented to them that "they" were "licensed, bonded, and insured:"

> Q.    Now did you ever make any inquiry about whether or not they were licensed, bonded and insured?
> A.    Yes, sir, that was presented to me at our first meeting.
> Q.    Now when you say at your first meeting –
> A.    That was the meeting with Bill and Teresa Tanner at the home.
> Q.    Okay.  And Bill Tanner was present when that meeting took place?
> A.    Yes, sir, Bill Tanner and my wife were present at the time.
> Q.    And what, if anything, was said to you at that time?
> ....
>
> Q.    At that time what, if anything, was said to you about being licensed, bonded and insured?
> A.    It was explained to us – actually it was told to us that they were definitely licensed, bonded and insured at that time.

Transcript at 47-49.

He stated further that had he known that the company was not bonded and insured, he would not have purchased the lot or allowed the company to build his house. He testified:

> Q. If you had known that they were not bonded and insured, would you have signed the contract?
>
> ....
>
> A. No, sir, I would not have purchased the land and went into an agreement had I known that they were not bonded and insured.

Transcript at 59-60.

It is undisputed that at that time Mr. Tanner was a licensed home builder. However, he readily admitted that neither he nor the company was either bonded or insured. In fact, according to Mr. Tanner, he has never been bonded or insured in the over 35 years he has been engaged in the home building business. Moreover, he vehemently denied having ever told the LeDouxs that either he or the company was bonded and/or insured. Furthermore, neither Plaintiffs' Exhibit 6 nor the construction agreement ultimately entered into between the LeDouxs and Tanner Construction (Plaintiffs' Exhibit 9) contains any provision requiring either Mr. Tanner or Tanner Construction to be bonded or insured.

Mr. LeDoux also testified that prior to executing Plaintiffs' Exhibit 6, he told Mr. Tanner that he and his wife had selected Lot 5, "because of privacy, for the purpose of privacy." Transcript at 51. He said that in response Mr. Tanner told him, "That if and when a home would be built on lot number four, that it would not be in my back door." Id. According to Mr. LeDoux, that was all that was said at that time about the matter.

Mr. Tanner testified that no such conversation with respect to Lot 4 occurred. He also testified that neither of the LeDouxs ever expressed any concerns about privacy, or about the prospective location of any house that might be built on Lot 4, or about the possibility of a house being built on Lot 4 too close to their property line.[1] Mr. Tanner also testified that when the LeDouxs were selecting lots, they viewed Lot 4. He stated that he actually walked that lot with them and showed them the approximate places where a house could be built on that lot. Those places included the site reflected on the subdivision map and other locations approximately 25 feet forward and backwards from that site.

---

[1] The Court notes that subsequent to the alleged conversation described by Mr. LeDoux, Mr. LeDoux told Mr. Tanner to move the location of his house 25 feet closer to the road to accommodate the possible installation of a pool in his back yard. That move caused the house to be built in a spot less parallel to, and more in front of, the house site on Lot 4.

5

At this point, the Court must note that neither of the agreements between the LeDouxs and Tanner Construction contained any limitations with respect to the location, orientation, or posture of the house.

After Plaintiffs' Exhibit 6 was executed on August 23, 2000, Mr. Tanner obtained waste water management permits from the health department for all five lots. Those permits were required before Mr. Tanner could begin the process of clearing the lots. Thereafter he began clearing trees from locations on the lots where the driveways and houses were to be situated and, in the process, began filling the substantial trench which stretched across the front one-third of Lot 5. The reason he obtained permits for all of the lots at the same time, instead of just for Lot 5, was because he needed the stumps of the trees cut from all of the lots to fill in the trench on Lot 5.

The process of clearing trees and miscellaneous brush and organic debris from the lots, hauling the trees, moving dirt from the area where the houses and driveways were to be located, burning the brush, and filling the trench on Lot 5, took several weeks. Approximately 100 trees were knocked down, hauled off, and sold in the process. To fill in the trench on Lot 5, Mr. Tanner cleared the old tires and other trash from it, lined the bottom of it with a single layer of the stumps from the trees which had been removed from the lots, covered those stumps with dirt, laid another layer of stumps on top of that, covered that layer of stumps with dirt, and packed it all down with a bulldozer. He said that he had previously employed that identical technique to fill a hole approximately 30 feet deep on the site where a soccer field now sits in front of the church where he is a member. He said that the technique he used to fill the trench on Lot 5 is consistent with the standard of practice in the building industry and with what builders in general customarily do with respect to filling in similar holes on similar properties. He said that he considered the use of the stumps to help fill the hole as the ideal solution because it accomplished both the elimination of the hazard posed by the trench and the disposal of the stumps.

Mr. LeDoux testified that Mr. Tanner told him that his plan was to fill in the trench, compact it, and level it off, and that, "it would stay that way forever." Transcript, at 55. He said that Mr. Tanner told him that after the trench had been filled and leveled, the area would make a suitable spot for his children to play. He said that he told Mr. Tanner that his intent was to use that spot as a picnic area, and Mr. Tanner assured him that it would be suitable for that purpose and would remain, "nice and level, forever." Transcript at 59.

Mr. Tanner denied that he told Mr. LeDoux that the area, once filled in and leveled, would stay that way forever, or anything of the sort, or that he had any discussion with Mr. LeDoux about how long the fill would remain intact. There was not, however, any evidence presented which suggests that Mr. Tanner did not intend the fill job to stand to last. He said that Mr. LeDoux never expressed any concern about the fill eroding or collapsing. He said that he told Mr. LeDoux that the trench would be filled with stumps and dirt, and then be compacted with a bulldozer. He said that Mr. LeDoux

6

asked him if sod was going to be put there, and that he told Mr. LeDoux that seed and hay would be put out there and that it would make a good play area for his children.

On September 1, 2000, subsequent to the lots being cleared and the trench on Lot 5 being filled, the company entered into a written contract with the LeDouxs. The company agreed to build a house on Lot 5 according to the LeDouxs' plans and to complete the construction of that house by March 1, 2001. The LeDouxs agreed to pay the company $234,570 for the completed house and lot. Plaintiffs' Exhibit 9.

As the company was preparing to dig the basement for their house, Mr. LeDoux told Mr. Tanner that he wanted to position the house so that he could put a swimming pool behind it in the future. Mr. Tanner told Mr. LeDoux that to accomplish that result the house would need to be moved forward in the direction of the road because moving it backwards would interfere with the field lines. He told Mr. LeDoux that moving the house forward would require the installation of a pumping system to transport the sewage from the septic tank to the field lines because gravity would no longer be sufficient. He explained that this change would increase the cost. Based on that information, Mr. LeDoux told Mr. Tanner to move the house forward enough so that he could place a swimming pool between the back of it and the field lines and agreed to pay the additional costs involved in making that move.

Based on Mr. LeDoux's request that the house be moved forward to accommodate the future installation of a swimming pool, Mr. Tanner began construction of the house at a point 25 feet closer to McClendon Chapel Road than the original building site. Other than moving the house 25 feet closer to the road, there were no changes in orientation or relative position. That position placed the front of the house square to the road and its right side 15 feet or so from the lot's right boundary.

The move required the company to submit an amended application to the health department to put the septic tank on the left rear of the house, rather than the right rear as located on the original plan and to facilitate the installation of a pump tank and a feed line from the septic tank pump to the field lines in a path around the prospective site of the LeDouxs' anticipated pool.

The LeDouxs' authorized the company to perform the additional work and to purchase the materials required to accommodate the relocation of the house. The cost was $1,550, which included $550 for an extra septic tank, $650 for the septic tank pump and control, a $200 plumbing charge, and a $150 electrician fee. Those additional charges were paid by the LeDouxs to the company prior to closing.

Mr. LeDoux testified that just prior to closing, after his house had been completed, but prior to construction beginning on the house on Lot 4, he had a conversation with Mr. Tanner on the back deck of his house. He said that Mr. Tanner told him in that conversation that, "a privacy fence would separate the properties between lot four and lot five." Transcript, page 52. He said that his wife was present during that conversation.

Mrs. LeDoux did not testify, and Mr. LeDoux admitted that nothing in his contract required Tanner Construction to build a privacy fence between the two lots. Mr. Tanner denied that any such conversation ever took place and said that he never made any statements or promises or mention of any sort to either of the LeDouxs about a privacy fence.

The closing on the house and lot was completed on February 27, 2001. Plaintiffs' Exhibit 1. At that time, there were still a number of things which remained to be finished or corrected by the company. To prevent delay, the company agreed in writing to place $2,000 of the purchase price in escrow with the closing attorney to insure its completion of those items. Plaintiffs' Exhibit 12. The escrow agreement contained a list of 19 items that required completion or repair. Mr. LeDoux testified that the list contained in the escrow agreement represented all of the items which needed to be completed or repaired which he was aware of at the time. Mr. Tanner testified that, in his experience, it is common for a sale to be closed even though there are a few things remaining for the builder to finish or repair.

After the closing, the LeDouxs immediately took possession of the property and have lived there since. Mr. LeDoux said that, except for the 19 items listed in the escrow agreement, construction of the house was complete when he and his wife took possession of it.

The drawing admitted into evidence as Defendant's Exhibit 3 reflects the final location of the LeDouxs' house on Lot 5. Other than being 25 feet closer to the road, its position on the lot is the same as was the original site described on the final subdivision plan approved by the county health department. The house on Lot 4 was built on essentially the same spot as the building site described on the final subdivision plan. Its final location is reflected in the survey admitted into evidence as Defendant's Exhibit 11. The right side of the LeDouxs' house is parallel to, and approximately 15 feet from the right property line. Its left side is parallel to and, according to Mr. Tanner, approximately 75 feet from the left property line, which it shares with Lot 4. And its back left corner is approximately 90 feet from the front right corner of the house built on Lot 4.

Of the 19 items listed in the escrow agreement, 17 were ultimately corrected or completed, whichever was required, by the company. The other two items on the list remain unfinished, although neither witness indicated which of the two items on the list have not been completed.

According to Mr. LeDoux, he and his wife discovered additional problems with the house after they moved in. Water began leaking into their basement. Cracks developed in their garage floor and in the bricks on their front porch. A hole developed in the back yard to the right of the septic tank. The lawn work contracted for near the road had not been completed. The attic floor had not been completed. The back yard needed regrading from work done previously to repair water leakage into the basement.

8

The boards on the wood deck began to rise, crack and separate. And wiring was visible from the attic fan. Mr. LeDoux said that he sent several letters to the company about those problems and requested that they be corrected. According to his testimony, he requested the closing attorney to pay him the money being held in escrow. He said that he received no response from the company to his letters and was not paid the escrow funds by the closing attorney.

After receiving no response, according to his testimony, Mr. LeDoux sent a letter to the Better Business Bureau, complaining about the company's failure to correct the problems with his home. The company's building superintendent, Don Trim, came to the house; inspected all of the problems which Mr. LeDoux had listed in his letters to the company; told Mr. LeDoux what needed to be done to correct those problems; made various measurements on the deck, in the attic, and in the basement; told Mr. LeDoux that Mr. Tanner was gathering the materials necessary to make the needed corrections; and arranged to come back at a certain date at 8:00 a.m. to make those corrections. According to Mr. LeDoux, no one show up when promised and the problems were never corrected.

Mr. Tanner testified that about a year after the closing, Mr. LeDoux wrote a letter to the closing attorney asking for the escrow money to be turned over to him because all of the items listed in the escrow agreement had not been completed. The attorney then wrote the company a letter seeking an explanation. In response, Mr. Tanner told the closing attorney that the remaining unfinished items would be completed. He said that he was under the impression, until he received that letter from the closing attorney, that all of the items listed on the escrow agreement had been completed.

According to Mr. Tanner, after the company was contacted by the closing attorney, he instructed Mr. Trim to correct the remaining problems on the list. Mr. Trim reported back to him a few days later that he had been unable to contact Mr. LeDoux even though he had left messages on his various phone numbers, and had even left a note on his door. Mrs. Tanner, the president of the company, then, in April and May, 2002, sent three separate certified letters to the LeDouxs' address requesting access to the property to address the problems complained of. According to Mr. Tanner, the return receipts reflect that the LeDouxs received and signed for all three of the letters. But they did not respond to any of them. Mr. Trim subsequently ran into Mr. LeDoux in public and told him that they had been trying to get in touch with him so that arrangements could be made to correct the problems he had complained about. Mr. Tanner testified that, according to the Mr. Trim, Mr. LeDoux told him that he did not want anyone from the company on his property.

Mr. LeDoux could only recollect having received one certified letter from the company. And he denied having told Mr. Trim that he did not want anyone from the company on his property.

Mr. Tanner said that he is aware that the LeDouxs have obtained an engineer's report respecting the condition of their house, and he has reviewed that report. He said that the report merely describes some possible problems which the LeDouxs could have with the house in the future. He said that the report states that there is a crack in the concrete floor of the basement, and that the blocks in the rear corner of the basement wall are sitting on the concrete, so that there is a danger of them possibly sinking. According to Mr. Tanner, that is an inaccurate assessment, because the support of the house is sitting on a footing that was inspected and approved by the county building inspectors. He testified that he was at the LeDouxs' house the day before the trial of this matter, and inspected the same, and that the house is not sinking in any respect.

According to Mr. LeDoux, the area in his front yard where Mr. Tanner attempted to fill the trench has deteriorated substantially, and continues to deteriorate and fall in, and has already collapsed approximately 25 yards toward his house. That testimony by Mr. LeDoux regarding the current condition of his yard was controverted by Mr. Tanner. Mr. Tanner testified that the day before the trial of this matter he personally examined the area where the trench used to be, and that it looked the same to him as it did the day the closing took place.

Mr. LeDoux produced several photographs of the area in question that he took in 2003. Plaintiffs' Exhibit 8. He did not, however, point out how the images in those photographs differ in appearance from what the area looked like when he moved into the house. Absent such assistance, the Court cannot tell to what extent the yard may have changed from the condition it was in when the LeDouxs took possession of it, because the Court does not know and cannot tell merely from the photographs the location and size of the trench. Nonetheless, several of the photographs do depict a large trench crossing through the LeDoux's yard, and a bare, flat area, void of vegetation, where a substantial amount of fill dirt appears to have been dumped, packed down, and leveled off. And the edge of that area appears to drop off into the trench. That description agrees with Mr. LeDoux's verbal description of what is happening to the yard except that there does not appear to be 25 yards between the edge of the flat area and the other side of the trench.

Mr. Tanner testified that, after the construction of the house on Lot 4 began, Mr. LeDoux informed the county land development authorities that he thought the house on Lot 4 was being built too close to his property line. They in turn presented the question to Mr. Tanner. He hired an engineer to determine whether the position of the house on Lot 4 satisfied the requisite set back, which required the house to be at least 15 feet from the property line. The engineer determined that the house was positioned 14 feet, five inches from the property line, rather than the required 15 feet. Defendant's Exhibit 11. Mr. Tanner was informed by the county land development authority that the company could apply for a variance to allow the house to remain where it was being constructed. Plaintiffs' Exhibit 7. The company applied for the variance and it was granted on May 28, 2002. Id.

10

## II. Legal Framework

### A. Section 523(a)(2)(A)

Section 523(a)(2)(A) makes non-dischargeable debts for money, property, services or credit obtained by a debtor by, "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To have a debt declared non-dischargeable pursuant to 523(a)(2)(A), a creditor must prove, "the debtor made a false statement with the purpose and intention of deceiving the creditor; the creditor relied on such false statement; the creditor's reliance on the false statement was justifiably founded; and the creditor sustained damage as a result of the false statement." Fuller v. Johannessen (In re Johannessen), 76 F.3d 347, 350 (11th Cir. 1996). A false statement made without knowledge of its truth or falsity, in reckless disregard of the truth, is treated the same under 523(a)(2)(A) as a false statement made with knowledge of its falsity, and will suffice equally to render the resulting debt non-dischargeable. "[R]eckless disregard for the truth or falsity of a statement constitutes a 'false representation' under § 523(a)(2)(A) of the Bankruptcy Code." Birmingham Trust Nat'l Bank v. Case, 755 F.2d 1474, 1476 (11th Cir. 1985).

Contrary to the debtor's contentions, the LeDouxs successfully pled grounds for non-dischargeability pursuant to section 523(a)(2)(A), even though they did not specifically refer to that code provision in their complaint. They alleged that: (1) Mr. Tanner's alleged promise to finish their home by March 1, 2001, was false and constituted "fraud in the inducement;" (2) his alleged promise not to put the house on Lot 4 "in [their] back door," was knowingly false and made to "induce [them] to enter into the [construction agreement];" (3) Mr. Tanner failed "to disclose to the Plaintiffs that a hole was filled in the Plaintiff's [sic] front yard with 'decomposable material,'" even though he had a "duty to disclose" that information; (4) all of those "statements... were false, and were made maliciously, intentionally, willfully, and /or without sufficient knowledge to form an accurate, knowledgeable statement;" and (5) he and his wife suffered injuries and damages as a result of those statements having been made to them. Amendment to Complaint at 1-3, filed November 16, 2005, Proceeding No. 18 (parentheticals added).

Those allegations roughly parallel the elements required for a debt to be declared non-dischargeable pursuant to section 523(a)(2)(A), and are sufficient to put Mr. Tanner on notice of the essence of what the LeDouxs are contending. See, e.g., Harmon v. Kobrin (In re Harmon), 250 F.3d 1240, 1246 n. 4 (9th Cir. 2001)("A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose and the debtor's omission was motivated by an intent to deceive."); Palmacci v. Umpierrez, 121 F.3d 781, 787 (1st Cir. 1997)("If, at the time he made his promise, the debtor did not intend to perform, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met).").

11

## B.  Section 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code makes non-dischargeable a debt for any "willful and malicious" injury caused by a debtor to another person.  The definitions of those two particular terms of art have long been established and recognized in this circuit:

> In order that a provable liability come within this exception the injuries must have been both willful and malicious.  An injury to person or property may be a malicious injury within this provision if it was wrongful and without just cause or excuse, even in the absence of personal hate, spite or ill will.  The word "willful" means nothing more than intentionally doing an act which necessarily leads to injury.  Therefore, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury.

Vickers v. Home Indemnity Co. (In re Vickers), 546 F.2d 1149, 1150 (5th Cir. 1977).[2]

Moreover, the U. S. Supreme Court has addressed those accepted definitions by reiterating and reemphasizing that non-dischargeability under section 523(a)(6) requires, "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."  Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).  Reckless, wanton, or negligent acts will not suffice.  The debtor must have actually intended "... 'the consequences of an act,' [i.e., the injury] not simply 'the act itself.'"  Id. at 61-62 (quoting Restatement (Second) of Torts § 8A, comment a, p. 15 (1964)).

## C.  Burden of Proof

The burden is on the LeDouxs in this proceeding to prove the elements of either section 523(a)(2)(A) or section 523(a)(6) by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 291 (1991).  "The burden of showing something by a 'preponderance of the evidence,' the most common standard in the civil law, 'simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence."'"  Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for So. Cal., 508 U.S. 602, 622 (1993)(quoting In re Winship, 397 U.S. 358, 371-372 (1970)(brackets in original)(citation omitted)).  "Before any such burden can be satisfied in the first instance, the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty."  Id. at 622.

---

[2] See also Hope v. Walker (In re Walker), 48 F.3d 1161, 1164 (11th Cir. 1995);  In re Ikner, 883 F.2d 986, 991 (11th Cir. 1989); In re Latch, 820 F.2d 1163, 1166 n.4 (11th Cir. 1987); In re Dardar, 620 F.2d 39, 40 (5th Cir. 1980).

12

### III.  Application of Law to Facts

In summary, the evidence submitted by the LeDouxs fails to prove that Mr. Tanner personally owes them any debt.  Therefore, there is no basis for concluding that Mr. Tanner personally owes them any debt which is not dischargeable, by virtue of either 11 U.S.C. § 523(a)(2)(A) or 11 U.S.C. § 523(a)(6), in his Chapter 7 case.  To the contrary, the record is void of any facts which suggest that Mr. Tanner intended to defraud the LeDouxs or that he deliberately intended to injure either them or their property in any way.  And there are no facts from which any such intent may be inferred.  Each of the LeDouxs' theories of recovery is discussed below in light of the evidence presented.

### A.  Bonded and Insured

### 1.  The Complaint

Mr. LeDoux testified that he and his wife were told, at a meeting attended by them and Mr. and Mrs. Tanner, that "they" (Mr. and Mrs. Tanner) were "bonded and insured."  He also said that he would not have agreed to allow them to build his home if he had known that "they" were not "bonded and insured."  Mr. Tanner's attorney interposed a timely objection to the admissibility of that testimony, but the Court conditionally allowed Mr. LeDoux to offer it, with the caveat that a final determination with respect to its admissibility would be made after the trial and the entire matter was submitted for determination.

In making that determination, the Court notes first that there is no reference in the LeDouxs' complaint to any such representation or conversation.  And there is no reference to anyone either being bonded or insured or not being bonded or insured. The subject is simply not mentioned.

In that light, the LeDouxs' attorney advised the Court, prior to offering any evidence, that evidence would be offered about statements allegedly made by Mr. Tanner with respect to being "bonded and insured," as well as evidence that neither Mr. Tanner nor Tanner Construction were "bonded or insured."  At that time he characterized that prospective evidence as being relevant to show a <u>willful and malicious basis for non-dischargeability</u>.  However, after his conclusion of the presentation of the LeDouxs' case in chief, and in his closing argument, he argued that the testimony given by Mr. LeDoux was relevant to prove that the statements attributed by him to Mr. Tanner with respect to being "bonded and insured" constituted a basis for non-dischargeability pursuant to section <u>523(a)(2)(A)</u>, <u>or fraud</u>.  This is important because the LeDouxs did not file a motion for leave to amend their complaint prior to trial to include grounds for non-dischargeability based either on that particular alleged misrepresentation or the fact that neither Mr. Tanner nor Tanner Construction were "bonded and insured."  And they did not amend their complaint to include any such grounds for non-dischargeability.  In contrast however, a verbal motion for leave to

13

amend may fairly be implied from the arguments made by their attorney at trial and the offer of Mr. LeDoux's testimony on the subject. With recognition of that verbal motion, the Court must now rule on the admissibility of the evidence submitted regarding Mr. Tanner's alleged "bonded and insured" statement.

## 2. The Debtors' Objections to Admissibility of Evidence of Whether Mr. Tanner was Bonded and Insured are Sustained

Mr. Tanner's attorney strenuously objected to Mr. LeDoux's testimony with respect to the alleged "bonded and insured" misrepresentation both prior to trial and at the time that it was offered, as well as to this Court's consideration of either that testimony or the fact that Mr. Tanner was not "bonded and insured" as grounds for non-dischargeability. Both objections must be <u>sustained</u> for several reasons.

First, the LeDouxs had ample time and opportunity prior to trial to amend their complaint to include contentions that Mr. Tanner was not "bonded and insured" and his alleged misrepresentation regarding that fact. They did not. Moreover, it would be patently unfair to consider matters first thrust on the debtor at trial without his having had any opportunity to prepare a defense to them.

Second, the debtor did not consent to or acquiesce in the trial of those new issues, but instead objected to the Court's consideration of them and the admission of the evidence offered by the LeDouxs in support of them.

Consequently, leave to amend must be denied. And since the LeDouxs may not amend their complaint to include contentions regarding either Mr. Tanner's not being "bonded and insured" or his alleged misrepresentation regarding that fact, Mr. LeDoux's testimony with respect to those issues is inadmissible and may not be considered as evidence in this case.

Assuming <u>arguendo</u>, however, that the LeDouxs had been allowed to verbally amend their complaint to include contentions and to plead those contentions as grounds for non-dischargeability, as discussed below, the evidence presented does not prove those allegations.

## 3. Section 523(a)(2)(A)

With respect to the LeDouxs' section 523(a)(2)(A) fraud contention in regard to whether Mr. Tanner was bonded and insured, they have failed to prove by the preponderance of the evidence that Mr. Tanner told them that either he or Tanner Construction was bonded or insured. The only evidence presented to prove that Mr. Tanner made that statement is Mr. LeDoux's testimony. But Mr. Tanner testified to the contrary. He denied having ever told the LeDouxs that either he or the company was

14

bonded or insured.  And his testimony is no less worthy of belief than Mr. LeDoux's. Therefore, the preponderance of the evidence is no more sufficient to prove that Mr. Tanner made the statement than it is to prove that he did not make the statement.

There are additional reasons for ruling against the LeDouxs on this point.  Mr. LeDoux said that his wife was present at the meeting in which Mr. Tanner allegedly made the "bonded and insured" statement.  But Mrs. LeDoux did not testify at trial. Because she did not, it may be reasonably inferred from her failure to testify that Mrs. LeDoux would have not been able to corroborate her husband's testimony on the subject.[3]

---

[3] "When a party to a civil action fails to testify and explain facts and circumstances peculiarly within his knowledge and ability to provide, the inference is justified that the testimony would be adverse ...." United States v. Marlow, 235 F.2d 366, 368 (5th Cir. 1956)(action by widow of deceased veteran to recover proceeds of National Service Life policy which named her as beneficiary wherein she contended marriage of second wife to veteran was invalid because of existence of prior undissolved marriage of veteran at time second marriage was entered into, but where widow did not testify, there was an inference that first marriage had been dissolved). See also United Broadcasting Co. v. Armes, 506 F.2d 766, 770 (5th Cir. 1975)(in action brought by client to enjoin private investigator from proceeding with suit in Mexico to recover fee for certain services and investigator's counterclaim for his fee, jury could infer from failure of client to appear and testify that his testimony would have been unfavorable to his cause), cert. denied, 421 U.S. 965 (1975); Leveson v. United States, 262 F.2d 659, 661 (5th Cir. 1959)(in civil proceeding on claim to recover $16,833 in cash seized by the United States from safe located in room adjacent to illegal betting establishment, failure of claimant, who owned the safe, to testify or otherwise attempt to explain presence of money in the safe could be considered as evidence of the fact that money was being used in the gambling operation); Daniel v. United States, 234 F.2d 102, 106 (5th Cir. 1956)(in civil action brought by United States against nonveteran for fraudulently obtaining surplus trucks through veterans in violation of Surplus Property Act, failure of defendant to either take the stand, or show that he was unable to testify, or even to offer any excuse whatever for his failure to testify in explanation of suspicious facts and circumstances peculiarly within his knowledge, fairly warranted the inference that his testimony, if produced, would have been adverse to his cause), cert. denied, 352 U.S. 971 (1957); Williams v. United States, 199 F.2d 921, 922-923 (5th Cir. 1952)(in civil action filed by the United States for condemnation of a truck and automobile alleged to have been used in violation of the Internal Revenue Laws by carrying materials to be used in the illegal manufacture of illicit whiskey, failure of claimants of vehicles to take the stand to explain, or attempt to explain, what they intended to do with the materials found in the vehicles was a circumstance which could be considered against them); Anderson v. United States, 185 F.2d 343, 346 (5th Cir. 1951)(in proceedings filed by United States for purpose of condemning and forfeiting an automobile alleged to have been used in illegal deposit and concealment of tax-unpaid distilled spirits, intent to defraud could be inferred from failure of claimant of automobile to testify since "[t]he pertinent and controlling evidence was within his knowledge and it was within his power to explain the circumstances connected with the transaction, yet he declined to testify.").

Case 05-00170-BGC    Doc 48    Filed 03/15/07    Entered 03/15/07 15:01:41    Desc Main
Document    Page 15 of 30

Also, the parties' contract provides, in paragraph 9, that it, "expresses all agreements between the parties concerning the subject matter hereof and supercedes all previous understandings relating thereto, whether oral or written, and shall be binding upon and shall inure to the benefit of the heirs, administrators, executors, successors and assigns of the parties hereto." Plaintiffs' Exhibit 9, page 3, paragraph 9. But the construction agreement that the LeDouxs entered with Tanner Construction (Plaintiffs' Exhibit 9) does not contain any representation that the company is either bonded or insured. The subject is simply not mentioned.

If Mr. Tanner had made such a statement prior to the execution of the contract, the parties should have addressed that in the contract. Consequently, the LeDouxs' execution of the contract, warrants that they had no "understandings" outside the confines of the contract. That in turn implicitly contradicts Mr. LeDoux's assertion that he and his wife in fact had an "understanding," based on what Mr. Tanner allegedly told them, that was not reflected in the contract.

Furthermore, Mr. LeDoux neglected to explain what he understood Mr. Tanner to mean by the words "bonded and insured," or what those words purportedly meant to him, or what kinds of bond and insurance were involved. In addition, he did not explain what benefit it would have been to his wife and him if the company had been "bonded and insured", or how exactly the failure of the company to be "bonded and insured" resulted in any injury or detriment to his wife and him.

---

"The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. Silence then becomes evidence of the most convincing character." Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226 (1939)(citations omitted)(in suit by the United States to enjoin defendants from carrying out alleged conspiracy in restraint of interstate commerce between distributors and exhibitors of motion picture films, failure of defendants to tender the testimony, at their command, of those officers who had authority to act for the distributors and who were in a position to know whether they had acted in pursuance of agreement was itself persuasive evidence that their testimony, if given, would have been unfavorable to the defendants). "'It is well settled that the production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." Creel v. C.I.R., 419 F.3d 1135, 1142 (11th Cir. 2005)(in proceeding by IRS to levy on civil tax liabilities allegedly remaining unpaid after taxpayer's criminal restitution obligation was satisfied, Tax Court properly inferred from failure of IRS to present witness from U.S. Attorney's Office that any testimony from such a witness would have been unfavorable to the IRS). See also Harris v. C. I. R., 461 F.2d 554, 556 (5th Cir. 1972)(where, in proceeding arising from disallowance of gift tax exclusions on the basis of original instruments despite amendments in a later year to adopt language which would have qualified taxpayers for exclusions if used in the original instruments, the attorney who drafted the instruments represented taxpayers at trial and said in his opening statement that the discrepancy between the original and amended instruments resulted from mere typing errors, but did not take the stand to testify, the Tax Court properly inferred that his testimony would not have been favorable to his clients).

## 4. Section 523(a)(6)

On the issue of the LeDouxs' section 523(a)(6) contention in regard to whether Mr. Tanner or his company was bonded, the LeDouxs failed to submit any relevant evidence except for Mr. Tanner's alleged representation. And that representation has not been proved by a preponderance of the evidence. In addition, the LeDouxs failed to prove that Mr. Tanner or Tanner Construction was required, by statute or otherwise, to be "bonded and insured," or that Mr. Tanner had any duty to make sure that Tanner Construction was "bonded and insured." Thus, there is no proof that Mr. Tanner breached any legal duty to the LeDouxs with respect to his or Tanner Construction's obtaining or maintaining any such bond or insurance. And without the breach of a legal duty, there can be no compensable injury or a non-dischargeable injury under section 523(a)(6).[4] Furthermore, there is no proof that Tanner Construction's failure to be bonded or insured necessarily resulted from anything done by Mr. Tanner personally.

A similar situation was addressed by the Court of Appeals for the Eleventh Circuit in Hope v. Walker (In re Walker), 48 F.3d 1161, 1165 (11th Cir. 1995). In In re Walker the court determined that the financial consequences resulting from a debtor's intentional failure to obtain or maintain insurance do not constitute a "willful and malicious injury" for purposes of section 523(a)(6). The court recognized, "Because Congress reenacted section 523(a)(6) in the context of the common law, we conclude that a debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." Id. In regard to this case, the problems that the LeDouxs are experiencing with their house, such as the incomplete work, things needing repair, erosion or deterioration of the front yard, did not occur because Mr. Tanner and Tanner Construction were not "bonded and insured," and those problems were not substantially certain to result from the fact that Mr. Tanner and Tanner Construction were not "bonded and insured." Consequently, even if the LeDouxs could theoretically have called upon any such bond or insurance to compensate or reimburse them for the problems they are experiencing, an assumption which they have not proved, any adverse economic consequences experienced by them as a result of Mr. Tanner's and Tanner Construction's failure to obtain or have any such bond or insurance would not be non-dischargeable under section 523(a)(6).

To paraphrase the court's opinion in In re Walker, while Mr. Tanner's alleged failure to make sure that he and/or Tanner Construction were bonded and insured may

---

[4] A duty "is an essential of every action at law." Sloss-Sheffield Steel & Iron Co. v. Wilkes, 236 Ala. 173, 181 So. 276, 278 (1938), overruled on other grounds, Henderson v. Wade Sand & Gravel Co., 388 So.2d 900 (Ala. 1980). "A cause of action is made up of a duty and its breach." Alabama Fuel & Iron Co. v. Bush, 204 Ala. 658, 86 So. 541, 542 (1920). "A cause of action is made up of a duty and a breach of it." Birmingham Ry., Light & Power Co. v. Littleton, 201 Ala. 141, 77 So. 565, 572 (1917).

17

have, theoretically speaking, resulted in the LeDouxs being unable to call on an insurance or bonding company to pay to correct the problems, it cannot be said that Mr. Tanner, by not obtaining any such bond or insurance, intended for the LeDouxs to experience those problems, or that Mr. Tanner's and/or Tanner Construction's failure to be bonded or insured led to those problems.

## B. Positioning of House on Lot 4

### 1. Section 523(a)(2)(A)

The LeDouxs apparently contend that Mr. Tanner failed to honor an alleged promise not to put the house on Lot 4 in their "back door," and that any injury which they may have suffered as a result of that alleged breach of promise is not dischargeable under section 523(a)(2)(A). The evidence submitted by them in support of that theory is: (1) the relative locations of their house and the house built on Lot 4; and (2) Mr. LeDoux's testimony that Mr. Tanner told him, "That if and when a home would be built on lot number four, that it would not be in my back door." Transcript at 51.[5]

Mr. Tanner denied making that statement or any other promise or assurance to either Mr. or Mrs. LeDoux with respect to the proximity or location of the house to be built on Lot 4. To the contrary, Mr. Tanner testified that, before the LeDouxs chose Lot 5, he showed them approximately where the house on Lot 4 would be located. Consequently, there is equal evidence with respect to whether or not Mr. Tanner made the statement attributed to him from Mr. Tanner and Mr. LeDoux. That evidence does not weigh in favor of the LeDouxs because Mr. LeDoux's testimony carries no more weight than that given by Mr. Tanner. It cannot, therefore, be concluded from that evidence that it is more likely than not that Mr. Tanner made the statement attributed to him by Mr. LeDoux. Indeed, it can just as easily be concluded, based on Mr. Tanner's testimony, that he did not make that statement. The LeDouxs have, therefore, failed to satisfy the requisite burden of proving, by a preponderance of the evidence, that Mr. Tanner told them that the house on Lot 4 would not be built in their "back door," which, of course, obviates a section 523(a)(2)(A) non-dischargeability determination based on that alleged representation.

Moreover, the contracts signed by the LeDouxs do not contain any reference to either Lot 4 or any house to be built on any lot other than Lot 5. That fact, along with

---

[5] Contrary to the contentions contained in paragraphs 9-13 of the LeDouxs' complaint, they presented no evidence that Mr. Tanner told them that the house on Lot 4, "would not be built that close to the property line...," or that the house on Lot 4, "was actually built within Fourteen (14) feet of the property line," or that the applicable set back for the house on Lot 4 was 30 feet from the property line. Amendment to Complaint at 2, filed November 16, 2005, Proceeding No. 18.

18

the fact that the LeDouxs executed those contracts without requiring any provision specifying or limiting the location of the house to be built on Lot 4, does not agree with Mr. LeDoux's testimony regarding what Mr. Tanner allegedly told him.  Because it stands to reason that had Mr. Tanner made that representation to him, Mr. LeDoux would have sought to clarify that inconsistency before signing those contracts.  And the fact that he executed both of those contracts without clarifying that issue is inconsistent with, and therefore detracts from the credibility of, his testimony about what Mr. Tanner purportedly told him.

Furthermore, even if the evidence had shown that Mr. Tanner assured Mr. LeDoux that he would not put a house in his "back door," it is apparent from the evidence that he honored that assurance.  The house is, according to the unrefuted evidence, 90 feet from the LeDouxs' house.  And given that the LeDouxs' house is 75 feet from the property line which they share with Lot 4, it can reasonably be concluded that a house built <u>anywhere</u> on Lot 4 in substantial accordance with the requisite 15 foot set-back would satisfy the assurance allegedly given by Mr. Tanner to Mr. LeDoux.  And it cannot be reasonably concluded that 14'5" feet, which is how far the house on Lot 4 is from the property line, does not substantially satisfy the 15' set back requirement, especially given the variance granted by the county land development authority.

Nothing said by Mr. LeDoux detracts from the foregoing conclusions.  He did not explain to the Court what message he meant to convey to Mr. Tanner by telling him that he selected Lot 5 for the purpose of privacy, or say that by use of those words he meant to convey any message to Mr. Tanner about the prospective location, orientation or posturing of any house which might be built on Lot 4.  Mr. LeDoux's words "because of privacy, for the purpose of privacy," do not expressly or implicitly communicate a request for Mr. Tanner not to build the house on Lot 4 in any particular location.  And they did not ask Mr. Tanner to assure him that the house on Lot 4 would not be situated in any particular location.

Mr. LeDoux did not explain to the Court what he thought Mr. Tanner meant by the "back door" statement that he allegedly made or how that statement possibly reflected some sort of agreement not to build the house on Lot 4 in its current location.  He did not explain how the current location of the house on Lot 4 violates or does not comport with Mr. Tanner's alleged promise that it "would not be in [the LeDouxs'] back door."  He did not explain what other placement, if any, of that house would have satisfied or comported with Mr. Tanner's alleged promise that it "would not be in [the LeDouxs'] back door."  He did not ask Mr. Tanner to clarify that statement on the occasion that it was allegedly made.  He did not indicate to Mr. Tanner what sites on Lot 4 were unacceptable to him in regard to his privacy concerns or explain to the Court how Mr. Tanner was supposed to have known Mr. LeDoux's unspoken wishes in that regard.  He did not say how far away from the property line Mr. Tanner would have had to build the house on Lot 4 for it, in his mind, to comport with the statement allegedly made by Mr. Tanner, or explain how he arrived at any such understanding from the words allegedly spoken by Mr. Tanner.  He did not indicate to the Court where he

19

thought Mr. Tanner should or could have put the house on Lot 4 where it would not have been in his "back door," according to his interpretation of that phrase.

Similarly, the words purportedly spoken by Mr. Tanner do not, given their common, ordinary meaning, reflect a promise that the house on Lot 4 would or would not be placed on any particular location on that lot, or that the house on Lot 4 would or would not be placed any given distance from the property line, or in any particular position with respect to its occupants' view of the LeDouxs' house.

In addition, the record is void of any evidentiary basis upon which the Court might conclude that Mr. Tanner's alleged statement was false in any respect, or that Mr. Tanner did not in fact honor his alleged promise. Mr. Tanner did not have any reason to believe that the LeDouxs did not want him to put the house on Lot 4 where he put it. He did not have any reason to believe that his placement of the house on Lot 4 in that location would not comport with his alleged assurance that it would not be placed in the LeDouxs' "back door." And, he did not have any reason to believe that his placement of the house on Lot 4 in that location was not, on its face, consistent with his alleged assurance.

Moreover, it is apparent that the LeDouxs could not have possibly relied in fact on the alleged "back door" statement by Mr. Tanner as assurance that the house on Lot 4 would not be built in its present location, because that is not what Mr. Tanner allegedly said. Furthermore, even if the LeDouxs had relied in fact on Mr. Tanner's alleged "back door" statement as assurance that the house on Lot 4 would not be built in its present location, they would have been unjustified in doing so, again because that is not what Mr. Tanner allegedly said. The words he purportedly used could not have been reasonably interpreted in that fashion, but were reasonably interpretable to allow for the construction of the house on Lot 4 in precisely that location, as well as any other location on Lot 4.

In addition, as indicated before, neither the contract to hold the lot, or the construction agreement, contains any reference to either Lot 4 or any house to be built on that lot. Had it been that important to them that the house on Lot 4 not be built in any particular location, it seems apparent that they would have insisted that it be made a part of at least one of those contracts. So the fact that they did not, suggests that the ultimate location of the house on Lot 4 was not that important to them. And if the location of the house on Lot 4 was not that important to them, they could not possibly have relied on any statement allegedly made by Mr. Tanner regarding the final location of that house.

And finally, Mr. LeDoux did not explain precisely what he finds objectionable about the location of the house on Lot 4. He <u>did not say</u> that the location of the house impinges on his and his family's right to privacy or interferes with their enjoyment of their property, or otherwise inconveniences them in way. He did not <u>present any evidence as to how exactly</u> the location of the house impinges on his and his family's

20

right to privacy, or interferes with their enjoyment of their property, or how they otherwise are being inconvenienced by the location of that house. He did not testify that he would have selected another lot or would not have selected Lot 5 if he had known that Mr. Tanner was going to put a house on Lot 4 in the location where it now stands. What he did say was that he does not like where the house on Lot 4 sits in relation to his house, but he did not elaborate.

Consequently, it cannot be concluded that: (1) the house on Lot 4 impinges on the LeDouxs' right to privacy; (2) it interferes with their enjoyment of their property; (3) they would have done anything differently with respect to building on and purchasing Lot 5 even if they had know where the house on Lot 4 would ultimately be located; or (4) they have otherwise suffered any injury as a result of the positioning of the house on Lot 4. These conclusions preclude any determination of non-dischargeability under both section 523(a)(2)(A) and section 523(a)(6).[6]

## 2. Section 523(a)(6)

The LeDouxs failed to explain any basis for a section 523(a)(6) cause of action in regard to Mr. Tanner's placement of the house on Lot 4. According to the evidence, Mr. Tanner's placement of the house on Lot 4 has caused no injury to the LeDouxs. There is no evidence that Mr. Tanner built the house on Lot 4 in its present location for the purpose of injuring the LeDouxs, or that the placement of that house was substantially certain to result in injury to them. Mr. Tanner had no duty not to build the house on Lot 4 in its current location and was entirely within his lawful rights to place it there. Therefore, Mr. Tanner's placement of the house on Lot 4 in its current location cannot, in any respect, be considered malicious or wrongful or without just cause.[7] Consequently, the LeDouxs' are not owed a non-dischargeable debt pursuant to section 523(a)(6) as a result of Mr. Tanner's placement of the house on Lot 4.

## C. The privacy fence

Mr. LeDoux testified that after his house had been completed, but prior to closing and prior to construction beginning on the house on Lot 4, Mr. Tanner told him that, "a privacy fence would separate the properties between lot four and lot five." Transcript at 52. Mr. Tanner denied that any such conversation ever took place and said that he

---

[6] It must be noted that Mr. LeDoux is responsible for the final positioning of his house. He insisted that it be moved forward 25 feet. That decision placed the house in a position less parallel to, and more in front of the house on Lot 4.

[7] "'Whatever a man has a legal right to do, he may do with impunity, regardless of motive, and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a bad motive in exercising the right.'" BellSouth Mobility, Inc. v. Cellulink, Inc., 814 So.2d 203, 215 (Ala. 2001)(quoting Texas Beef Cattle Co. v. Green, 921 S.W.2d 203, 211 (Tex.1996)).

never made any statements to either of the LeDouxs about a fence separating the two lots. Since Mr. LeDoux's testimony and Mr. Tanner's testimony constitute all of the evidence on the subject, and Mr. LeDoux's testimony is entitled to no more weight than that which must be accorded to Mr. Tanner's testimony, it must be concluded that the LeDouxs failed to satisfy their burden of proving by a preponderance of the evidence that Mr. Tanner made the statement. Consequently, a determination of non-dischargeability cannot be premised on that alleged statement, and it may not be accorded any evidentiary significance for any other purpose as well.

Furthermore, Mr. LeDoux testified that his wife was physically present when Mr. Tanner allegedly made that statement. Again, her failure to testify detracts from the credibility of Mr. LeDoux's assertion that Mr. Tanner indeed made that statement. See note 3 above.

But even if Mr. Tanner had made the statement about a privacy fence being built between the two lots, a determination of non-dischargeability could not have been premised on that statement. The LeDouxs' house had already been completed when that statement was allegedly made, which precludes the possibility that they relied in fact on it in making their decision to buy Lot 5 or have Tanner Construction build a house on that lot.

Furthermore, Mr. LeDoux did not say that he and his wife relied on that statement for any purpose, or explain how they relied on that statement, or how they were injured by their reliance on that statement. And because Mrs. LeDoux did not testify, it cannot possibly be concluded that she relied on that alleged representation or that her reliance on the same, if any, was justified.

### D. The trench in the front yard

The evidence does not support the LeDouxs' allegations in their complaint regarding the trench in the front yard. They allege:

> 14. That in addition thereto, the Defendants, either at the time of entering into the contract or during construction and/or closing, did not disclose to the Plaintiffs that a hole was filled in the Plaintiff's front yard, with "decomposable material," and after the decomposition of said material, the front yard would cave in in areas, and the Plaintiffs would have to have additional work done on their front yard.

> 15. That the Plaintiffs contend that the withholding of said information (which the defendant had the duty to disclose) was malicious, willful, and/or intentional, thus causing the Plaintiffs to be damages.

Amendment to Complaint at 3, filed November 16, 2005, Proceeding No. 18.

Case 05-00170-BGC   Doc 48   Filed 03/15/07   Entered 03/15/07 15:01:41   Desc Main
Document   Page 22 of 30

Contrary to these allegations, Mr. LeDoux did not testify that Mr. Tanner failed to tell him that "decomposable materials" were used to fill the trench. He merely said that Mr. Tanner told him that, "his plans were to fill in the land, fill in that area, compact it, cover it in, and that it would stay that way, and level it off, grade it and level it off and it would stay that way forever." Transcript at 55. In contrast, Mr. Tanner testified that he specifically told Mr. LeDoux that tree stumps would be used to fill in the trench. He testified:

> Q. Do you remember if there was a dip or a swag or whatever you want to call it in the front yard of lot five?
>
> A. Yes, I do.
>
> Q. And do you recall the LeDoux's questioning you about that and how that would be filled in?
>
> A. I believe at the time the time the LeDoux's – I am really not sure of the time line but there was a discussion about what was to be done with that hole. Primarily I was aware of it when I bought the ten acres. It was a hazard. It was very deep and it had water at the bottom of it, coming out of the ground, a little seeping creek, and when I was planning the lot five's finishing, I felt like that it needed to be filled in for safety sake and also for esthetics and enhancement of the lot.
>
> Q. Now at that time did you indicate to the LeDoux's exactly what you would do in order to fill it in?
>
> A. I did and, in fact, I think we probably had started that and had already begun that prior to that time, but I am really not sure of the time line but, yes, it was discussed.
>
> Q. Did you tell them at that time that you would be filling it in with brush and trees and stuff like that?
>
> A. No, sir, I did not. <u>I told them that it would be only stumps.</u> We took down approximately a hundred trees on all the five lots and the trees themselves, the logs were hauled off and sold. The brush was burned. The hole in question was filled with the stumps, laced in with dirt and walked in with a bulldozer.
>
> Q. Did the LeDoux's indicate to you at that time that they had a concern that that would decay and would cause a problem with the front yard?
>
> A. No, sir, we had no conversation about that.
>
> Q. Did you indicate or tell them at that time that there would not be a problem with any decay or any problem with the front yard?
>
> A. No, sir. The only discussion that I recall is Mr. LeDouxs wanted to know if there was going to be some sod out there, and I told him that we would put seed and hay out there and that it would be a good place for a possible play area for his children.
>
> ....

Case 05-00170-BGC    Doc 48    Filed 03/15/07    Entered 03/15/07 15:01:41    Desc Main
                    Document       Page 23 of 30

THE WITNESS: The reason that I got all five permits was because Mr. LeDoux had expressed some interest in lot five and, <u>as I explained to him</u>, my plan was to dispose of the stumps of trees on all five lots in that hole in order to combine those stumps with dirt to get it up to a proper level that would be safe and aesthetically valuable to the property. And so it was imperative that I go ahead and clear the trees on the driveway and home location areas in order to transfer the stumps into the hole before we got to a point we could not enter the lot because of constructing the house.

Transcript at 26-27; 98 (emphasis added).

The above, which was not controverted by Mr. LeDoux at trial, proves that, contrary to the contentions contained in paragraphs 14 and 15 of the LeDouxs' complaint, they knew, prior to entering into the construction agreement, that tree stumps were going to be used, and were used to fill that trench.

Mr. LeDoux testified that Mr. Tanner told him that once the trench area was filled and leveled that it would stay that way forever and would make a good play area for his children. And even though Mr. Tanner denied having told Mr. LeDoux that the filled area would stay that way forever, that or substantially the same representation can be implied from Mr. Tanner's statement that the area, once filled and leveled, would make a good play area for the LeDouxs' children. Mr. Tanner admits having said that and therefore the statement carries the same message, since the area would definitely <u>not</u> make a good play area for the LeDouxs' children if it were going to implode.

In addition, with respect to how he filled in the area, Mr. Tanner testified that he used the same technique that he used to fill a similar area in a different location where a soccer field still stands today. Consequently, it is clear that he fully expected the filled-in area in the LeDouxs' yard to remain steadfast, just as the area beneath the soccer field has. And he expected that technique to produce the same result in the LeDouxs' yard.

### 1. Section 523(a)(2)(A)

It is apparent that Mr. Tanner's representations with respect to the relative longevity and durability of the filled area in the LeDouxs' front yard merely constituted his expression of an opinion based on his professional experience, expertise and judgment rather than a statement of fact as is required to satisfy the false representation requirement of section 523(a)(2)(A). "[T]o be actionable under 11 U.S.C. § 523(a)(2)(A), a representation must be one of existing fact, and not merely an

Case 05-00170-BGC    Doc 48    Filed 03/15/07    Entered 03/15/07 15:01:41    Desc Main
Document    Page 24 of 30

expression of opinion or expectation." <u>Carney v. Dupree (In re Dupree)</u>, 336 B.R. 506, 517 (Bankr. M.D. Fla. 2005).[8]

Moreover, absent knowledge on Mr. Tanner's part that the statement he made was false, or that he did not know whether it was false or not, the Court cannot conclude that Mr. Tanner intended to deceive the LeDouxs. Certainly it cannot be presumed, without evidence, that Mr. Tanner did not expect the fill to last. And no evidence was presented which suggests that Mr. Tanner did not believe, or had reason not to believe, that the technique which he employed to fill the trench would produce a lasting result.

To the contrary, the only evidence on the subject consists of Mr. Tanner's testimony, which indicates clearly that he had substantial reason to believe that the job would endure because he had successfully employed the same technique in a similar situation on a prior occasion involving an even deeper hole. He also testified that the technique which he employed was consistent with the standard of practice in the building industry and with what builders in general customarily do with respect to filling similar holes on similar properties. Consequently, it cannot be concluded from the evidence presented that Mr. Tanner knew or should have known that the fill would not endure, or that he had any reason to think that it would not, or that he did not know whether it would endure or not. In his mind, he was certain that it would. That conclusion precludes a determination that by sharing that opinion he intended to deceive the LeDouxs in any way.

## 2. Section 523(a)(6)

For the LeDouxs to succeed with their section 523(a)(6) claim, they would have had to present evidence that Mr. Tanner deliberately filled the trench in a manner that would insure that it would fall in or deteriorate back to its original condition after the

---

[8] <u>See also</u>, <u>Evans v. Dunston (In re Dunston)</u>, 146 B.R. 269, 279 (D. Colo. 1992); <u>Hodgin v. Conlin (In re Conlin)</u>, 294 B.R. 88, 100 (Bankr. D. Minn. 2003); <u>Haney v. Copeland (In re Copeland)</u>, 291 B.R. 740, 762 (Bankr. E.D. Tenn. 2003); <u>Bank of Commerce v. Hoyt (In re Hoyt)</u>, 277 B.R. 121, 132 (Bankr. N.D. Okla. 2002); <u>Minnesota Client Security Board v. Wyant (In re Wyant)</u>, 236 B.R. 684, 697 (Bankr. D. Minn. 1999); <u>Caldwell v. Hanes (In re Hanes)</u>, 214 B.R. 786, 810 (Bankr. E.D. Va. 1997); <u>McMullen v. Klaiman (In re Klaiman)</u>, 202 B.R. 813, 816 (Bankr. D. Conn. 1996); <u>Mozeika v. Townsley (In re Townsley)</u>, 195 B.R. 54, 61 (Bankr. E.D. Tex. 1996); <u>Loomas v. Evans (In re Evans)</u>, 181 B.R. 508, 512 (Bankr. S.D. Cal. 1995); <u>Kuper v. Spar (In re Spar)</u>, 176 B.R. 321, 327 (Bankr. S.D.N.Y. 1994); <u>Smith v. Myers (In re Schwartz & Meyers)</u>, 130 B.R. 416, 423 (Bankr. S.D.N.Y. 1991); <u>Mortgage Guaranty Ins. Corp. v. Pascucci (In re Pascucci)</u>, 90 B.R. 438, 444 (Bankr. C.D. Cal. 1988); <u>Barnes v. Pallo (In re Pallo)</u>, 65 B.R. 101, 104 (Bankr.W.D.Ky.1986); <u>Oppenheimer v. Reder (In re Reder)</u>, 60 B.R. 529, 536 (Bankr. D. Minn. 1986); <u>Lisk v. Criswell (In re Criswell)</u>, 52 B.R. 184, 197-198 (Bankr. E.D. Va. 1985); <u>McMillan v. Firestone (In re Firestone)</u>, 26 B.R. 706, 715 (Bankr. S.D. Fla. 1982).

LeDouxs bought the property, or that he somehow intentionally sabotaged the job for the purpose of injuring the LeDouxs. But the LeDouxs presented no such evidence. There was even no evidence with respect to how Mr. Tanner went about filling and leveling the trench, how he could have filled and leveled the trench in a different manner that would have insured that it would remain that way over time, or how the technique employed by Mr. Tanner was substantially certain to result in the trench not holding up. That expectation was founded in the technique he employed, a proven technique that was substantially certain to produce an enduring result.

The Court must conclude from the evidence that Mr. Tanner <u>did not</u> deliberately mishandle the fill job so that it would eventually fall in or deteriorate. And he <u>did not</u> intentionally sabotage that work in order to injure the LeDouxs. Instead, the evidence supports opposite conclusions. Mr. Tanner intended to produce a benefit to the LeDouxs by filling the trench in a manner that would last over time. He employed a technique that was reasonably certain to produce that beneficial result. He performed that work in a manner that was substantially certain to produce that beneficial result. Consequently, the LeDouxs' section 523(a)(6) claim on this point must fail.

### E. Homeowner's or builder's warranty

Mr. LeDoux testified that, under the terms of his construction agreement, Plaintiffs' Exhibit 9, he was supposed to receive, "a homeowner's warranty, one year homeowner's, builder's warranty, enclosed in the contract." Transcript at 52. While no one, including Mr. Tanner, told him that he was entitled to any such separate warranty, according to his interpretation of the contract, he was entitled to receive a separate document containing and outlining the provisions of that so-called warranty. But he did not specify what provision in the construction agreement grants him that entitlement, or what provisions that separate warranty was supposed to have contained, or what obligations it was supposed to have imposed on either Mr. Tanner or Tanner Construction. In addition, he did not attempt to show how his failure to receive any such separate document could have possibly resulted in any compensable, non-dischargeable injury to him. And even if he had, there is no evidence that Mr. Tanner was a party to the construction agreement. And because Mr. Tanner was not a party to that agreement, ostensibly he would not have been a party to any such separate warranty. And any breach of the construction agreement by Tanner Construction through a failure to provide the separate warranty or breach of the separate warranty itself by Tanner Construction could not have, without more, created a debt from Mr. Tanner to the LeDoux's, much less one that would not have been dischargeable in Mr. Tanner's bankruptcy case.

In addition, there is no reference in the LeDouxs' complaint to any such contractual provision or separate warranty. The LeDouxs did not explain to the Court how Mr. LeDoux's testimony tends in any way to prove that Mr. Tanner owes a non-dischargeable debt to the LeDouxs. And the Court cannot find the relevance or significance of that testimony to the issues raised by the LeDouxs in their complaint.

Consequently, the Court must conclude that the testimony on this point is not relevant to any of the issues involved in this case.

Moreover, the Court has searched the agreement. It contains no promise that the LeDouxs will receive a separate, one-year homeowner's or builder's warranty. It does, however, contain the following warranty, in Paragraph 6, which is no doubt what Mr. LeDoux was referring to:

> Builders agrees to perform the labor and furnish materials as set forth above within a reasonable time prior to occupancy. Work shall be performed in a manner acceptable to the Builder, the Owners, and appropriate inspection authorities. The Builder warrants to the Owners that the residence will be constructed substantially in accordance with the aforesaid plans and specifications. The warranty shall apply only to such incidence of substantial nonconformity with said plans and specifications as to which the Owners shall give written notice to the Builder at any time or times within one year from substantial completion of the aforesaid construction agreement. Builder and Owners acknowledge that there are no other warranties, expressed or implied, made by the Builder to Owner.

Plaintiffs' Exhibit 9, paragraph 6, page 2.

Contrary to Mr. LeDoux's testimony, he and his wife did in fact receive their promised one-year warranty, albeit not a separate one.

### F. Completion of the house by March 1, 2001; the escrow agreement; and problems surfacing post-closing

At trial, Mr. LeDoux placed great emphasis on: (1) what items remained to be done with respect to his home when the closing of the sale occurred, that is the items in his "escrow agreement;" (2) Mr. Tanner's progress with respect to those items; (3) the problems which arose after closing; and (4) Mr. Tanner's response, or lack thereof, to complaints about those problems. In contrast, the LeDouxs did not mention any of those things in their complaint and they did not offer any explanation of their relevance at trial. Consequently, the Court cannot determine how these relate to a non-dischargeable debt pursuant to either section 523(a)(2)(A) or section 523(a)(6).

### 1. Section 523(a)(2)(A)

All of the above occurred after the execution of the construction agreement. So none of them could have been employed to fraudulently induce the LeDouxs to enter into that agreement.

Furthermore, the LeDouxs' complaint contains no allegation that Mr. Tanner fraudulently induced the LeDouxs to enter into the escrow agreement or to close the

27

sale prematurely.  It is apparent, therefore, that the LeDouxs do not contend that Mr. Tanner fraudulently induced them to enter into the escrow agreement or to close the sale prematurely.

Moreover, the LeDouxs offered no evidence that Mr. Tanner did not intend to perform the items listed on the escrow agreement. That fact precludes the conclusion that Mr. Tanner fraudulently committed to perform those items in order to induce the LeDouxs into closing the sale prematurely.  Also, the fact that 17 of the 19 items listed in the escrow agreement were ultimately corrected or completed, precludes any such conclusion, even if the LeDouxs had pled that theory and attempted to prove it.

## 2.  Section 523(a)(6)

With respect to section 523(a)(6), the LeDouxs did not allege in their complaint that Mr. Tanner intentionally sabotaged their house, deliberately performed substandard work, or maliciously did any other thing that was substantially certain to cause either the problems listed on the escrow agreement or those experienced by them after closing.  Furthermore, the LeDouxs did not present any evidence of the same.  Therefore, the Court cannot conclude that Mr. Tanner did anything, with respect to either the items listed on the escrow agreement or the problems which occurred after closing, that could have, or did result in, any non-dischargeable injury to the LeDouxs through section 523(a)(6), even if the LeDouxs had pled such a theory in their complaint.

In contrast, the Court recognizes that the LeDouxs offered testimony about the escrow agreement: (1) to show that the house was not complete by March 1, 2001, as was, according to the LeDouxs, promised in the construction agreement; and (2) to evince an intent on Mr. Tanner's part not to complete the house by March 1, 2001. That testimony apparently was offered to support the allegations in paragraphs 4 and 5 of their complaint and the conclusions that Mr. Tanner fraudulently induced them to enter into the construction agreement by promising to have the house ready by March 1, 2001, but that he did not intend to perform that promise from the outset. Paragraphs 4 and 5 read:

> 4.  That at the time the Plaintiffs negotiated the contract with the above named Defendant, the above named Defendant made certain representations that the house (the "home") which was covered under the contract would be finished and ready for occupancy by March 1, 2001.

> 5.  The Plaintiffs contend that the statements which were made were intentional, malicious, willful and/or misleading, and that the statements did constitute fraud in the inducement in that said representations partially induced the Plaintiffs to enter into the contract to purchase the home.

Amendment to Complaint at 2, filed November 16, 2005, Proceeding No. 18.

28

First, the promise referred to above by the LeDouxs is contained in paragraph 7 of the construction agreement between them and Tanner Construction. Mr. Tanner is not a party to that contract, and Mr. LeDoux did not say that Mr. Tanner personally told him that the house would be completed by March 1, 2001. Consequently, the evidence conclusively reflects that Mr. Tanner did not make the representation described in paragraph 4 of the LeDouxs' complaint.

Second, the contract does not provide that the house would be "finished and ready for occupancy" by March 1, 2001, as the LeDouxs stated in their complaint. It says that the, "building shall be completed by March 1, 2001." And it defines "completed" in a manner which allows for, "slight deviations from plans and specifications ...." Specifically it provides in the same paragraph containing completed by March 1, 2001, the following caveat, "Slight deviations from plans and specifications shall be construed as substantial compliance with this agreement." Plaintiffs' Exhibit 9 at 2, paragraph 7.

The LeDouxs' actions in consenting to closing the sale, entering into the escrow agreement, and taking possession of the house, despite the unfinished items listed on the escrow agreement, constitute an admission by them that the house had been "completed," within the confines of the language of the contract allowing for "slight deviations." When they moved into the house, the 19 items listed on the escrow agreement constituted "slight deviations from plans and specifications," which conclusively rebuts their present contention that the house had not been completed by the designated date.

Furthermore, the fact that the LeDouxs were able to occupy the house immediately, and reside in it, and use it for its intended purpose, and that Tanner Construction, according to Mr. LeDoux's own testimony, ultimately corrected 17 of the 19 items on the escrow agreement, conclusively precludes any inference that the items on that list represented anything more than "slight deviations from plans and specifications."

Moreover, the fact that only 19 relatively minor items remained undone after closing does not preclude the conclusion that the house was "complete" on March 1, 2001, when the LeDouxs took possession of it, given the restriction placed on the meaning of that term in the contract. To the contrary, the fact that the LeDouxs were able to move into the house and live in it suggests that it was in fact, at that point "complete" except for "slight deviations from plans and specifications," and that the 19 items on the list in fact constituted only "slight deviations from plans and specifications."

Consequently, according to the evidence, the promise referred to by the LeDouxs in paragraph 4 of their complaint, which is more accurately described as a promise that the house would be "completed" by March 1, 2001, except for "slight deviations from plans and specifications," was honored. That proves conclusively that Tanner Construction and Mr. Tanner intended for it to be honored all along, which

29

precludes the conclusion that it was fraudulently made or that its alleged non-performance injured the LeDouxs in any manner.

Third, by entering into the escrow agreement, and taking possession of the house with knowledge of the problems listed therein, the LeDouxs effectively waived their right to claim, in this or any other proceeding, that the 19 unfinished items represented a non-performance of Tanner Construction's promise to have the house completed by March 1, 2001.

Fourth, there is no evidence that, on or before the construction agreement was executed on September 1, 2000, either Tanner Construction or Mr. Tanner did not intend to complete the house by March 1, 2001. Indeed, the fact that the promise was honored proves conclusively that Tanner Construction and Mr. Tanner intended for it to be honored all along. Moreover, neither the fact that 19 relatively minor items remained undone after closing nor the fact that other problems arose after the closing is relevant with respect to the issue. Neither supports the inference that the September 1, 2000, promise to complete the house on March 1, 2001, would not be honored. To the contrary, the fact that the house was substantially finished on March 1, 2001, supports the inference that Mr. Tanner fully intended for the house to be completed by March 1, 2001. And since, according to that evidence, as well as the lack of any positive evidence which suggests a contrary inference, the making of that promise did not constitute a misrepresentation and cannot be considered in any way fraudulent.

## IV. Conclusion

Based on the above, the Court concludes that: (1) Mr. Tanner neither defrauded the LeDouxs nor willfully and maliciously injured them in any manner; and (2) the LeDouxs failed to prove, by a preponderance of the evidence, any basis for concluding that Mr. Tanner personally owes them any debt, or that he owes them any debt which is non-dischargeable by virtue of either 11 U.S.C. § 523(a)(2)(A) or 11 U.S.C. § 523(a)(6). Consequently, their complaint must be denied.

A separate order will be entered contemporaneously with this Memorandum Opinion.

Dated: March 15, 2007            /s/Benjamin Cohen_____
                                 BENJAMIN COHEN
                                 United States Bankruptcy Judge
BC:sm
cc:   Mr. Jerry Quick, attorney
      Mr. Thomas Reynolds, attorney
      Trustee

Case 05-00170-BGC    Doc 48    Filed 03/15/07    Entered 03/15/07 15:01:41    Desc Main
Document    Page 30 of 30